**2026 UT App 100**

## THE UTAH COURT OF APPEALS

NEIL BRUCE JOHNSON,
Appellee,
*v.*
MOAB CITY,
Appellant.

Opinion
No. 20240925-CA
Filed July 2, 2026

Seventh District Court, Moab Department
The Honorable Don Torgerson
No. 190700052

Christopher G. McAnany, Attorney for Appellant

Justin L. James and Dillon Olson,
Attorneys for Appellee

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and JOHN D. LUTHY concurred.

TENNEY, Judge:

¶1     This case is about who owns a parcel of land (the Disputed Parcel) that's located in Moab, Utah, and it turns on two documents from the late 1800s. The first is the 1886 Moab Townsite Plat (the Plat), and this document identified the Disputed Parcel as a public street. The second is a conveyance of land that was issued in 1890 by the federal government (the Luster Patent), and this document conveyed the Disputed Parcel to James Luster.

¶2     During the ensuing years, Neil Johnson's ancestors obtained land adjacent to the Disputed Parcel, and they also purportedly used most of the Disputed Parcel for their own purposes. In 2008, Johnson learned that Moab was asserting

ownership of the Disputed Parcel and was intending to use it to expand a city road, so Johnson filed a quiet title action. There, Johnson asserted that Luster's family owned the Disputed Parcel pursuant to the Luster Patent, and Johnson then claimed that he was now entitled to it because his family had adversely possessed it for over a century. Moab counterclaimed with a quiet title action of its own, asserting that it owned the Disputed Parcel based on the Plat.

¶3 The district court partially granted Johnson's motion for summary judgment. In the court's view, (1) the Luster Patent controlled, not the Plat, thus giving title to Luster, and (2) under principles of adverse possession, Johnson's family was entitled to seven-eighths of the Disputed Parcel and Moab was entitled to one-eighth of it. Moab now appeals that decision.

¶4 For the reasons set forth below, we reverse. Contrary to the district court's conclusion, Moab obtained title to the Disputed Parcel through the Plat. Because Johnson has not filed an adverse possession action against Moab (and, indeed, could not do so), the district court should have granted Moab's motion for summary judgment. We accordingly remand the matter to the district court with instructions for it to enter summary judgment in Moab's favor.

BACKGROUND[1]

*The Disputed Parcel*

¶5 On November 16, 1886—10 years before Utah became a State and 16 years before Moab was incorporated—Probate Judge

---

1. As discussed more fully below, the two sides filed competing motions for summary judgment, and we're ultimately reversing the decision to grant one side's motion and directing the court to grant the other side's motion. Unless otherwise noted, our

(continued…)

Jasper Robertson "approved" the Plat, which designated land for 25 city blocks and 12 streets as being part of Moab's city center. This approval "follow[ed] completion of a United States government survey in 1884." The Plat was recorded in 1891.[2] The Disputed Parcel is wholly contained within a street designated on the Plat.

¶6      On February 24, 1890, Luster executed a warranty deed in which he conveyed some property to Johnson's great-grandfather, John Wilcox (the Luster-Wilcox Deed). The Disputed Parcel was not included in this conveyance. The Luster-Wilcox Deed did refer to the Plat, however, identifying the boundaries of the conveyance at issue by referring "to Stone No[.] 3 of Plat designated 'Moab Town.'"

¶7      In July 1890—which was after the Plat was approved but before it was recorded—the United States Government issued the Luster Patent, and this document conveyed to Luster 120 acres in and around Moab.[3] The Disputed Parcel is contained within the Luster Patent.[4] Luster died intestate in or before 1892, and there is

---

recitation is drawn from facts that were deemed undisputed by the district court or for which we see no dispute in the record.

2. The Plat contains two purported recording dates: 1891 and 1893. The reason for there being two recording dates is unclear, but because the difference between the dates is not material to our resolution of this appeal, we'll refer to the Plat as having been recorded in 1891 for purposes of this opinion.

3. A land patent is an "instrument by which the government conveys a grant of public land to a private person." *Patent*, Black's Law Dictionary (12th ed. 2024).

4. This timeline shows that Luster did not yet own the land he conveyed to Wilcox in the Luster-Wilcox Deed. No party identifies this anomaly as a problem relevant to this appeal.

no record showing that the Disputed Parcel was ever conveyed by Luster or his estate.

*Historic Use of the Disputed Parcel*

¶8    Although the Luster-Wilcox Deed did not convey the Disputed Parcel to Wilcox, Johnson contends that he and his predecessors have possessed the Disputed Parcel since that 1890 conveyance. Johnson's father purchased the land next to the Disputed Parcel from Wilcox in 1937 and built a family home there. The majority of the Disputed Parcel contains mature trees and a fence that have been used as part of the Johnson family's yard. No taxes have been assessed against the Disputed Parcel, and Johnson and his predecessors have thus not paid any property taxes on it.

¶9    Sometime in the early 1960s, Moab installed utilities in the Disputed Parcel, including a twelve-inch domestic water line, a sanitary sewer line, and stormwater lines, and other public utilities for telephone, power, and natural gas was also installed on the Disputed Parcel over the years.[5] In the 1970s, Moab installed curb, gutter, and pavement in the area, and these improvements extended about 20 feet into the Disputed Parcel.

¶10    Johnson was about six years old when Moab installed the initial domestic water line on the Disputed Parcel, and he later testified in a deposition that he recalled his parents being angry that Moab had not sought their permission.

¶11    In 2008, a landowner intended to develop property near the Disputed Parcel, and Moab made plans to extend a street through the Disputed Parcel to access that development. Moab notified Johnson's father of the planned construction. That same year, Johnson took title to the property next to the Disputed Parcel on which the Johnson family home was located. After conducting

---

5. Moab does not have recorded easements for the utility lines in the Disputed Parcel.

some genealogical research about Luster's heirs, Johnson obtained quitclaim deeds from several persons that purported to convey the Disputed Parcel to him. Johnson retained counsel and issued demands to Moab in early 2009.

*The Litigation*

¶12   In 2019, Johnson brought a claim against Moab to quiet title to the Disputed Parcel. There, Johnson asserted that (1) Luster had obtained title to the Disputed Parcel in 1890 through the Luster Patent, (2) after Luster's death, the Disputed Parcel "was not transferred or conveyed to any owner by a recorded instrument," and (3) in 2008, Luster's heirs, "by quitclaim deed, transferred to Johnson and released all interest" in the Disputed Parcel. Johnson also alleged that "[d]espite obtaining legal title to the [Disputed Parcel] in 2008, Johnson and members of Johnson's family have used the [Disputed Parcel] since at least 1938 to access" their property. Moab soon counterclaimed with a quiet title action of its own, asserting that it owned the Disputed Parcel by virtue of the Plat.

¶13   Moab filed a motion for summary judgment early in the litigation. In this motion, Moab asserted that "the Disputed Parcel was dedicated as a public street pursuant to law" with the Plat's enactment and that Moab had accordingly obtained "title to that property for public road purposes." And this was so, in Moab's view, even though the Plat was recorded before Moab's incorporation. Moab argued that under the Utah Townsite Acts,[6]

---

6. The Utah Territorial Townsite Act was codified at sections 1166 through 1177 of the Compiled Laws of the Territory of Utah. Separately, the Utah Townsite Act was codified at Utah Code sections 57-7-1 through -19 until its repeal in 1999. Each statute was effective for only a portion of the relevant times in this case, but one of the two statutes was effective at any given moment, and they are substantively identical in most respects, so we do not

(continued…)

"governments were vested with all platted rights-of-way." Moab argued that "the preparation of the [P]lat was the *last step* following adjudication of any competing claims to lands within the proposed townsite," and it asserted that for the Plat, this was completed in November 1886, "as evidenced by the dated signature of the probate judge." (Emphasis in original.) Moab then noted that the statute that later repealed the Utah Townsite Acts had stated that "[a]ll existing lands previously under the jurisdiction of Title 57, Chapter 7, Townsites, shall fall under the jurisdiction of the city, town, municipality, or county in whose boundaries that the land is located." (Quoting Townsite Act Repeal, H.B. 359, 1999 Leg., Gen. Sess. (Utah 1999).) From all this, Moab's position was that it had obtained title to the Disputed Parcel through actions taken in 1886, which was before Luster had received it from the federal government in 1890.[7]

¶14 Moab also addressed Johnson's arguments about possession. Moab asserted that "[t]o the extent" that Johnson was attempting "to advance any claim to title based on . . . adverse possession" against Moab, the claim must fail "because those

---

differentiate between the two, and rather refer to them collectively as the "Utah Townsite Acts."

7. Moab also responded to Johnson's allegations that he obtained title to the Disputed Parcel in 2008 through quitclaim deeds from Luster's heirs, arguing that these deeds were "invalid" as "wild deeds." In apparent acceptance of this assertion, the district court later ruled that there was "no record that the Disputed Parcel [had] ever been conveyed by James Luster or his estate after he received it from the Federal Government in the original Luster [P]atent." And from this point in the litigation moving forward, Johnson appears to have abandoned any claim to the Disputed Parcel through these deeds, instead litigating solely based on his claims that (1) because the Luster Patent was superior to the Plat, Luster's heirs owned the Disputed Parcel and (2) the Disputed Parcel had "been in Johnson's family's exclusive control and possession for over a century."

claims are prohibited as against a municipality or other local government." (Citing Utah Code § 78B-2-216.) And Moab further argued that Johnson had not sufficiently pleaded a "claim based on adverse possession . . . against the Luster estate."

¶15   Johnson opposed Moab's motion. Johnson argued that "Moab's [m]otion and claim to ownership" failed because, in his view, the Plat "did not convey anything to Moab." Johnson argued that the United States government had conveyed the Disputed Parcel to James Luster in 1890 through the Luster Patent. Johnson then argued that, since that time, "the Disputed Parcel has been in Johnson's family's exclusive control and possession for over a century." Johnson accordingly argued that Moab's motion "should be denied and summary judgment should be granted" in his favor.

¶16   The parties participated in ongoing litigation for several years, including mediation and attempts to settle, during which time the district court did not rule on Moab's motion for summary judgment. Johnson eventually filed his own motion for summary judgment. In that motion, Johnson asserted that the Luster Patent was "superior" to the Plat, in part because the Plat had not been recorded until after the Luster Patent had issued. Johnson further argued that other than the Plat, Moab had no "deed or instrument by which it claim[ed] to have received ownership to the Disputed Parcel" and that Moab had "never possessed the Disputed Parcel." Johnson then claimed that he was entitled to the Disputed Parcel because it had "been in Johnson's family's possession and control since 1890."

¶17   The district court heard oral argument on the parties' competing motions for summary judgment. There, Moab argued that the Plat is "presumed to be validly executed and [to] comport with the necessary accoutrements that go with making a valid conveyance of land." Moab argued that the "effect of the [P]lat was to dedicate all streets to public use" and that there was "no evidence that any of the predecessors in title ever challenged the [Plat]." As it had done in its motion, Moab referred to the "historic

process that existed under [the] statute," and it again emphasized its view that recording the Plat was "the last step of that town site process." Of some note for this appeal, Moab also asserted that the Luster-Wilcox Deed's reference to the Plat "may be the best evidence that we can arrive at that the parties knew of, acquiesced in, [and] recognized the validity of the [Plat] and the street dedication that goes with that."

¶18 Addressing Johnson's claims, Moab contended that Johnson's arguments had "shifted" over the course of the litigation and that it "appear[ed] [that] a lot of what he's premised his argument on [was] based on possession." And on that front, Moab again argued that under Utah law, "a party cannot claim as against a government entity title by adverse possession."

¶19 For his part, Johnson asserted that Moab had no claim to the Disputed Parcel under the Plat because it did not have a "deed" or "chain of title" that could be "traced back to a district court judge who held the deed in trust and conveyed it out to [Moab]." Johnson further argued that his family had "been in possession" of the Disputed Parcel "for over 120 years," which, in his view, meant that a ruling in his favor based on "adverse possession" was "the logical conclusion."

*The District Court's Ruling*

¶20 The district court later issued a written ruling granting partial summary judgment to Johnson. There, the court concluded that "even though Moab reserved the [D]isputed [P]arcel as a street" in the Plat, "that reservation was void because the Federal Government had already removed it from consideration before Moab existed or the . . . Plat was recorded." In the court's view, the Plat was "utterly void and inoperative" because it was "issued for land that had been previously patented to another individual." (Quoting *Stoddard v. Chambers*, 43 U.S. 284, 318 (1844).)

¶21 After concluding that Luster's claim to title was superior to Moab's, the court ruled that it was "not materially disputed that

[Johnson] and his predecessors [had] possessed about" seven-eighths "of the area of the Disputed Parcel since at least 1937" and that Moab had "possessed the other" eighth "of the Disputed Parcel since at least the 1970s." The court then concluded that "[c]ombined, [Johnson] and Moab [had] easily met all requirements for adverse possession of the Disputed Parcel against the rest of the world and all unknown claimants, including Luster's heirs," and the court therefore quieted title according to the fractions noted above.

ISSUE AND STANDARD OF REVIEW

¶22 Moab appeals, arguing that the district court erred in granting partial summary judgment to Johnson. "We review a district court's grant of summary judgment for correctness and afford no deference to the court's legal conclusions." *Kirkham v. McConkie*, 2018 UT App 100, ¶ 5, 427 P.3d 444 (quotation simplified).

ANALYSIS

¶23 Moab challenges the district court's decision to quiet title to seven-eighths of the Disputed Parcel to Johnson. As it did below, Moab argues that it owns the Disputed Parcel by virtue of the Plat, which was approved in 1886. By contrast, Johnson claims that the Plat was not operative until it was recorded, and he then claims that by the time the Plat was recorded in 1891, the federal government had already given title to the Disputed Parcel to Luster through the Luster Patent.

¶24 We're thus confronted with a question of timing. After all, under settled law, a federal patent is "utterly void and inoperative" if it is "issued for land that had been previously patented to another individual." *Stoddard v. Chambers*, 43 U.S. 284, 318 (1844). Having considered the matter here, we conclude that Moab did have title before the 1890 Luster Patent. We therefore conclude that the district court should have granted Moab's

motion for summary judgment and denied Johnson's motion for summary judgment in its entirety.[8]

¶25    The Federal Townsite Act was a nineteenth-century statute that permitted settlers to take title to public lands in the American West, and it also established procedures for public officials to establish towns. *See* 43 U.S.C. § 718 (repealed 1976). This statute allowed a public official to "enter" the townsite land "at the

---

8. Johnson initially argues that Moab did not properly preserve this issue because it did not argue below that the district court should presume that "Judge Robertson entered the Disputed Parcel before 1886" or that there was "an earlier recordation date of 1886 for the [Plat]."

On the latter point, Johnson misperceives the nature of Moab's argument. Moab does not argue on appeal that the district court should have presumed a *recording* date of 1886. Rather, Moab argues that the *entry* of the Plat itself in 1886 was sufficient to grant it ownership over the Disputed Parcel.

As to the earlier argument, Moab did preserve it. "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an opportunity to rule on it." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (quotation simplified). In its motion for summary judgment, Moab argued that it held "vested" title to the Disputed Parcel through the Plat. It specifically asserted that "the preparation of the [P]lat was the *last step* following adjudication of any competing claims to lands within the proposed townsite," and it asserted that "this was completed" in 1886. (Emphasis in original.) And Moab further asserted that the Plat was "presumed to be valid, to be within the jurisdiction of the official, and [to be] executed in conformity with [the] law." Moab reiterated these same points to the district court during oral argument, telling the district court that it must "presume[]" that the Plat was "validly executed" and that the "necessary accoutrements that go with making a valid conveyance of land" had been performed. These arguments were sufficient to bring this issue to the court's attention, thereby preserving it.

proper land office," after which the lands that had been "so settled and occupied" were placed "in trust for the several use and benefit of the occupants thereof." *Id.*

¶26    The initial question is what the term "enter" meant. While its ordinary definition might suggest a physical entry onto the subject property, this is plainly not what the statute meant. After all, the statute required the public official to "enter" the land "at the proper land office." *Id.* In *Chotard v. Pope*, the United States Supreme Court accordingly held that the "term *entry*, as applied to appropriations of land" during this time period, referred to "that act by which an individual acquire[d] an inceptive right to a portion of the unappropriated soil of the country, by filing his claim in the office . . . of an entry-taker." 25 U.S. 586, 588 (1827) (emphasis in original). For purposes of the Federal Townsite Act, the term "enter" thus referred to the act by which a public official filed a claim to land.

¶27    Indeed, an early decision from the Utah Supreme Court has already recognized this. In *Lockwitz v. Larson*, a probate judge filed an application to "enter" a town site at a land office in 1891, the application was accepted in 1892, and money was paid (and a receipt was issued) in 1896. 52 P. 279, 280 (Utah 1898). In the meantime, however, some people began occupying the land in 1895, and they later claimed to have equitable title arising from their occupancy. *See id.* In the resultant case, the question before the court was "when . . . the land in dispute entered as a town site, so that the title vested in the trustee." *Id.* Relying on *Chotard*, our supreme court concluded that the relevant date for purposes of determining which party had a vested right in the property was 1891. *See id.* at 281. In the court's view, the term "entry" "meant the filing of an application by the proper officer with the register of the land office, and proof showing the performance of the statutory conditions respecting the settlement and occupancy of the land as a town site." *Id.* The court thus held that if the judge's "application be accepted, the entry allowed, the purchase money paid, and [the] patent issued, such patent will relate back to the date of the filing of the application." *Id.*

¶28 Importantly, the Federal Townsite Act did not contain an express requirement that the public official *record* a plat for this entry to be legally effective. *See* 43 U.S.C. § 718 (repealed 1976). Instead, once a public official entered the land at the proper land office, the official held the land in legal trust for the benefit of those already occupying the townsite. *See id.* And the statute provided that state regulations then governed the management of the resultant trust. *See id.*

¶29 Until Utah became a state in 1896, it implemented its regulations by way of the Utah Townsite Acts. Those acts required public officials who entered townsites to notify the public using a general circulation newspaper for at least three consecutive months after entry. *See* Compiled Laws of the Territory of Utah § 1167 (1876); Utah Code § 57-7-2 (repealed 1999). This notice would inform members of the public of their right to claim a parcel within the new townsite within six months after the official's entry. The Utah Townsite Acts also provided that a public official was required to execute and record a plat sometime after six months had passed and all claims had been adjudicated. *See* Compiled Laws of the Territory of Utah § 1175 (1876); Utah Code § 57-7-15 (repealed 1999). But of note, the Utah Townsite Acts did not provide a deadline for recording. *See* Compiled Laws of the Territory of Utah § 1175 (1876); Utah Code § 57-7-15 (repealed 1999).

¶30 Moab acknowledges that the "historical record in this case is incomplete" and that it does not have "documentation showing the day on which . . . Judge Robertson entered the land that he would later plat as Moab." There is also no official record showing that Judge Robertson properly notified the public through a newspaper for three consecutive months or that he waited six months before the Plat was approved in 1886. And we note here that this absence of documentation is perhaps no surprise given that these events occurred (if at all) 140 years ago.

¶31 But even so, Moab argues that we can presume that Judge Robertson did what was required. This argument is well taken.

Our supreme court has recognized a presumption that "public officers charged with the performance of official duty are presumed to have performed such duty at the proper time and in the proper manner." *Tooele Bldg. Ass'n v. Tooele High School Dist. No. 1*, 134 P. 894, 897 (Utah 1913); *see also E.C. Olsen Co. v. State Tax Comm'n*, 168 P.2d 324, 329 (Utah 1946) ("Unless the decision clearly shows on its face that it is not the act of the Commission, it will be presumed that it was regularly made unless the party attacking it shows the contrary.").

¶32   The court's decision in *Tooele Building Ass'n* illustrates this presumption well. There, the plaintiffs had alleged that a board of education election had not been conducted pursuant to certain requirements, such as holding a vote of "qualified electors" from the school district and providing proper notice of the meeting. *Tooele Bldg. Ass'n*, 134 P. at 897. On appeal from a dismissal of the complaint, the supreme court held that the plaintiffs had the burden of showing that public officials did not follow the requirements, and the court further held that without such a showing, it would "presume[]" that the required steps—including holding a vote by qualified electors and giving proper notice—had been taken "as provided by [the] law." *Id.*

¶33   Based on these authorities, we conclude that there is a rebuttable presumption in Utah that a public official performed his or her duties properly, and if a party asserts that the public official did not do so, that party bears the burden of rebutting the presumption. Applying this presumption to this case, we thus agree with Moab that although there are no official records showing (1) the date that Judge Robertson entered the Moab townsite, (2) that he provided proper notice through a newspaper to the community, and (3) that he waited the required six-month period before adjudicating all claims to the property and recording the Plat, we must still presume that Judge Robertson did these things because the record *does* tell us that he approved the Plat in 1886.

¶34 Johnson points to no evidence suggesting that Judge Robertson did not perform his duties "at the proper time and in the proper manner." *Id.* And again, to succeed on his claim, Johnson bore the burden of pointing to sufficient evidence to overcome this rebuttable presumption. But in any event, we note that there *is* evidence in this record corroborating Moab's assertion that the public had been alerted to the Plat's existence. The Luster-Wilcox Deed—which, as noted, was Luster's conveyance of some land to Johnson's great-grandfather—expressly mentioned the Plat when identifying the boundaries of that conveyance, referring "to Stone No[.] 3 of Plat designated 'Moab Town.'" This shows that, just a few years after Judge Robertson approved the Plat, members of the public—including Luster himself—were aware of its existence and its boundaries, which in turn supports the inference that Judge Robertson had complied with his obligations and had duly informed the public about it.

¶35 As a result, we are persuaded that based on the Federal Townsite Act, the Utah Townsite Acts, and the presumption that Judge Robertson acted in accordance with those acts, Judge Robertson had obtained title to the Disputed Parcel by virtue of entering the Plat in 1886, and this interest was later transferred to Moab. Because this title vested prior to the Luster Patent, Moab's title to the Disputed Parcel is superior.[9]

---

9. Johnson does not meaningfully argue that the Plat was ineffective as a means of establishing Moab's claim to the Disputed Parcel because it was entered before Moab was incorporated. In any event, we see no impediment there.

As Moab points out, Utah territorial law authorized the owner of legal title of any real property, including trustees holding legal title for the benefit of another, to plat the land and include "streets, alleys, and public places" in the plat. Laws of the Territory of Utah, Chapter L § 1 (1890). To take effect, the owner needed to record the plat with the county recorder's office. *See id.*

(continued…)

¶36 Johnson nevertheless pushes back with three main arguments, but we find none of them availing.

¶37 First, Johnson argues that "the recordation of the [Plat]" did "not automatically convey ownership to Moab" and that Moab cannot prove ownership of the Disputed Parcel without a deed. In support, Johnson points to a single statement from *Nelson v. Provo City*, where we held that in order for a "municipality to

---

§ 3. Once recorded, the plat served to dedicate all the streets shown in the plat to public use, and, by doing so, "vest the fee" to the land underlying those streets "for public uses for the inhabitants of such town." *Id.* § 4. Construing a later, substantially similar statute, the Utah Supreme Court held that the act of recording a plat vested fee title to its dedicated streets in the "county or city authorities." *White v. Salt Lake City*, 239 P.2d 210, 213 (Utah 1952) (interpreting Utah Code § 78-5-4 (1943)). As shown, Judge Robertson took legal title to the Moab townsite in or before 1886. By recording the Plat in 1891, Judge Robertson transferred fee title to all streets shown in the Plat to the political subdivision in whose boundaries the streets lay. This would have at first been the county and then Moab when it incorporated in 1902.

Alternatively, even if title did not transfer to the county or Moab through recording, under the Utah Townsite Acts, when a public official who held trust in property died, legal title automatically transferred to the official's successor in office. *See* Utah Code § 57-7-14 (repealed 1999). Thus, Judge Robertson's legal title would have automatically transferred from him to each successive county probate judge for over a century, and it would have remained in the probate court until 1999. The bill that repealed the Utah Townsite Acts in its entirety contained a transition clause reading, "All existing lands previously under the jurisdiction of Title 57, Chapter 7, Townsites, shall fall under the jurisdiction of the city, town, municipality, or county in whose boundaries that land is located." Townsite Act Repeal, H.B. 359 § 2, 1999 Leg., Gen. Sess. (Utah 1999). This clause would have transferred the trust from the county probate court to Moab.

own . . . land for itself, it, like any other claimant, would have to obtain a deed." 872 P.2d 35, 37 (Utah Ct. App. 1994). But read in context, this passage from *Nelson* does not mean that because Moab did not obtain a deed before the Luster Patent, Moab's title is inferior.

¶38    *Nelson* involved a dispute over some property in Provo. *See id.* at 35. Somewhere between 1869 and 1871, and pursuant to the Federal Townsite Act of 1869, the federal government had deeded the property (referred to in both *Nelson* and here as "the Roadway") "in trust to the local municipal authority"—namely, Provo's mayor. *Id.* At the time of the deed, the Roadway was used as a public thoroughfare and was not occupied. *See id.* Provo's mayor later deeded a plot to the north of the Roadway to one party, and he deeded a plot to the south of the Roadway to another party, but he did not convey the Roadway to anyone, and the Roadway continued to be used as a public thoroughfare. *See id.* at 36. But although the Roadway continued to be used as a thoroughfare, Provo never dedicated the Roadway for use as a public road, nor did Provo's mayor, as trustee, ever convey the Roadway out of the trust and to the city. *See id.* In 1989, Provo attempted to vacate the Roadway, and it then purported to sell the Roadway to a commercial developer. *See id.* The neighbors to the north and south sued. *See id.* After the district court ruled in Provo's favor, the neighbors appealed. *See id.*

¶39    On appeal, we held that in order for a "municipality to own land for itself, it, like any other claimant, would have to obtain a deed." *Id.* at 37. As noted, this is the language that Johnson relies on in this appeal. But contrary to Johnson's assertions, we did *not* hold that Provo lacked any ownership interest at all in the Roadway. Rather, we emphasized that because Provo had "never explicitly reserved the Roadway or obtained a deed" to the Roadway, Provo "remain[ed] holder of the Roadway in trust" rather than "as 'absolute owner.'" *Id.* A few paragraphs later, we again stated that Provo "still" held the Roadway "in trust and not in absolute ownership." *Id.* at 38. Because of this, we held that Provo continued to have the "attendant fiduciary duties to the

beneficiaries" of that trust—i.e., "the collective occupants of the town." *Id.* at 37. And in light of these ongoing duties, we remanded the case with instructions for the district court to determine whether Provo, as "trustee of the Roadway," could sell the Roadway to private developers. *Id.*[10]

¶40    Read in its full context, we conclude that the statement from *Nelson* upon which Johnson relies simply does not mean that because Moab had not obtained a deed before the Luster Patent was issued, the Luster Patent was superior. Rather, at most, the impact of *Nelson* would be that if it were true that Moab "never explicitly reserved [the Disputed Parcel] or obtained a deed" to it, Moab would only retain ownership over it in trust (as opposed to having obtained "absolute" ownership over it), and Moab would therefore have ongoing fiduciary duties toward residents of the city with respect to its use. *See id.* But in contrast to the dispute in *Nelson*, Johnson has not claimed here that Moab is violating any fiduciary duties with respect to its use of the Disputed Parcel.

¶41    Second, Johnson also argues that under the principles set forth in *Hall v. North Ogden City*, 175 P.2d 703 (Utah 1946), Moab cannot show that the occupants of the Disputed Parcel intended to dedicate lands to the public. Johnson argues that, like the property owners in *Hall*, he "and his predecessors in interest have used and occupied the Disputed Parcel since 1890," and he further

---

10. At the outset of the opinion, *Nelson v. Provo City* stated that the Roadway had originally been deeded "in trust to the local municipal authority, Provo Mayor Abraham O. Smoot, as trustee." 872 P.2d 35, 35 (Utah Ct. App. 1994). But in the various passages we've cited in the above paragraph, *Nelson* referred to actions later taken by Provo itself regarding the Roadway. Though somewhat unclear, it seems that *Nelson* was referring to the mayor and the city interchangeably in terms of who was acting as trustee. Regardless, what matters for purposes of this appeal is that *Nelson* was clear that the trustee—whether it was the mayor or the city—still retained some form of ownership over the property.

claims that the "Disputed Parcel is not currently a public street, was not a public street at the time of the [Plat's] recordation[,] and has not ever been used as a public street." Because of all this, Johnson argues that the Utah Townsite Acts "do not authorize Moab to transform paper rights into lawful ownership of the Disputed Parcel." But reading *Hall* in its full context, we disagree with Johnson's contention that it entitles him to any relief.

¶42   *Hall* concerned ownership over some land in North Ogden. *See id.* at 703–04. A group of early settlers had occupied and possessed the land in question, fencing it in and using it as farmland. *See id.* at 704. At some point after the settlers had begun occupying and using the land, a local probate judge entered a plat designating a certain portion of the land as being part of a public street. *See id.* Decades later, North Ogden attempted to build this long-platted but yet-unbuilt road across the land. *See id.* Litigation ensued, and the district court ruled in North Ogden's favor. *See id.* at 703, 713.

¶43   But the Utah Supreme Court reversed, instead quieting title in the land to the private occupants. *See id.* at 713. The court held that because the probate judge owed fiduciary duties to the prior occupants of the land as beneficiaries of the trust, the judge could not dedicate the land that they already occupied for the benefit of the larger public. *See id.* at 708–09. Thus, when the probate judge executed a plat dedicating the land for use as a public street, that dedication was void because it conflicted with the interests of the prior occupants. *See id.*

¶44   In light of this, we agree with Moab that the key feature of *Hall* is that the private landowners had occupied the property *before* the public official entered the land at the proper land office. Indeed, cases subsequent to *Hall* have already recognized this very thing. In *Cox v. Carlisle*, our supreme court held that because the plaintiff did not present "evidence of occupancy . . . at the time of . . . the Townsite Entry," the court's prior decision in *Hall*, "upon which plaintiff so heavily lean[ed], seem[ed] uncontrolling." 359 P.2d 1049, 1049–50 (Utah 1961). And in *Judd v. Kanab City*, our

supreme court held that a "critical fact[]" in the case before it was that the plaintiffs "did not claim occupancy and use of the disputed land before the [Federal and Utah] Townsite Act[s] became effective," and the court thus distinguished that case from *Hall* because, "[i]n *Hall*, the plaintiffs had claimed occupation and use *before*" those acts had even "become finalized." 672 P.2d 87, 88 (Utah 1983) (per curiam) (emphasis in original).

¶45    Here, the earliest evidence that Johnson has presented regarding his alleged predecessors' occupancy of the Disputed Parcel dates to 1890, but Johnson has presented no evidence showing that Luster (or anyone else) occupied the Disputed Parcel before it was entered at the public land office in 1886. As a result, Johnson's evidence is four years too late to have mattered under the principles set forth in *Hall*.

¶46    Third, Johnson argues that the Utah Townsite Acts could not have conveyed the Disputed Parcel to Moab because it has never been "necessary" to utilize the Disputed Parcel as a public street. For this argument, Johnson relies on language from the Utah Townsite Acts that allows a district judge to reserve lands "necessary for streets." Utah Code § 57-7-17 (repealed 1999). In Johnson's view, Moab failed to establish that the Disputed Parcel "is or ever was *necessary* for a public thoroughfare." (Emphasis in original.)

¶47    But Johnson did not make this argument below, at least not in any detail. And the district court likewise did not rule on this basis. While it's true that we can affirm on an alternate ground, this is only true for grounds that are apparent on the record. *See Pentalon Constr., Inc. v. Rymark Props., LLC*, 2015 UT App 29, ¶ 25, 344 P.3d 180. Here, although Johnson made a cursory and passing reference to this concept below, he never presented any evidence to the district court showing that, at the time of any of the relevant events, it could not have been "necessary" for Moab to have reserved this as a public street. Moreover, in his brief, Johnson does not meaningfully develop an argument about what it means to be "necessary" in this context. This matters, because to

persuade us that we should affirm on this alternate ground, Johnson would also need to persuade us that he's legally entitled to the requested relief. Without adequate briefing on the meaning of this term here, he has not carried this burden. We accordingly decline to affirm on this alternative basis.

¶48 For all these reasons, we agree with Moab that title vested in Judge Robertson when he entered the Plat sometime prior to November 1886 and that it later transferred to Moab. Because Judge Robertson obtained title before the Luster Patent, Judge Robertson's title was superior. And because of this, we conclude that the district court should have granted Moab's request for summary judgment and denied Johnson's request in its entirety. We accordingly reverse the district court's decision and remand with directions to grant Moab's motion for summary judgment.[11]

## CONCLUSION

¶49 For the reasons set forth in this opinion, the district court incorrectly granted partial summary judgment to Johnson. We reverse that decision and remand this matter with instructions for the district court to grant summary judgment in favor of Moab and thus quiet title to the entirety of the Disputed Parcel in Moab.

───────────

11. Because the district court held that title had vested in Luster, it then considered whether either Moab or Johnson could obtain title against Luster's heirs through adverse possession. As indicated, we've now reversed the district court's initial premise that title ever vested in Luster. Thus, we need not address whether the parties obtained title through adverse possession as against Luster.

On appeal, Johnson has not separately argued that he would be entitled to adverse possession as against Moab. And we note that under Utah Code section 78B-2-216(2), "a person may not acquire by adverse possession . . . any right in or title to any real property: (a) held by a government entity; and (b) designated for any present or future public use, including: . . . a street . . . ."